# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| LINDSAY and BENJAMIN DAVIS, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 7:17-cv-01533-LSC |
| J. MICHAEL WHITE, et al., | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| NICOLE and JONATHAN SLONE, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 7:17-cv-01534-LSC |
| J. MICHAEL WHITE, et al., | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| MONICA and JOHN LAWRENCE JR., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 7:17-cv-01535-LSC |
| J. MICHAEL WHITE, et al., | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

Plaintiffs Lindsay and Benjamin Davis (Case No. 17-533), Nicole Slone and Jonathan Slone (Case No. 17-534) and Monica Lawrence and John Lawrence, Jr. (Case No. 17-535) brought three separate actions against various Defendants alleging a deprivation of their constitutional rights under 42 U.S.C. § 1983, violations of the Federal Debt Collections Practices Act, a § 1983 conspiracy claim, and state law claims arising from Defendants' provision of sewer services to their homes in McCalla, Alabama.

Before this Court are Plaintiffs Lindsay and Benjamin Davis's (the "Davis Plaintiffs" or "Davises") amended complaint (doc. 33 in No. 17-533), Plaintiffs Nicole and Jonathan Slone's (the "Slone Plaintiffs" or "Slones") amended complaint (doc. 48 in No. 17-534) and Plaintiffs Monica and John Lawrence, Jr.'s (the "Lawrence Plaintiffs" or "Lawrences") amended complaint (doc. 44 in No. 17-535). The Plaintiffs in these actions have not asked the permission of the Court to amend their complaints. However, the Court interprets these as implied motions to file amended complaints. Also before this Court are various motions to dismiss by the Davis defendants (docs. 12, 14, 15 & 19 in No. 17-533), Slone defendants (docs. 16, 18, 31, & 44 in No. 17-534), and Lawrence defendants (docs. 16, 18, 26,

27, & 39 in No. 17-535). Defendants argue that these cases should be dismissed due to pleading defects in the allegations of the Plaintiffs' complaints that subject them to dismissal under Fed. R. Civ. P. 12(b)(6). Having the benefit of the parties' full briefing of these issues, the Davis Plaintiffs' implied motion to amend (doc. 33 in No. 17-533), the Slone Plaintiffs' implied motion to amend (doc. 48 in No. 17-534), and Lawrence Plaintiffs' implied motion to amend (doc. 44 in No. 17-535) are due to be granted, and the motions to dismiss by the Davis defendants (docs. 12, 14, 15 & 19 in No. 17-533), Slone defendants (docs. 16, 18, 31, & 44 in No. 17-534), and Lawrence defendants (docs. 16, 18, 26, 27, & 39 in No. 17-535) are due to be terminated as moot.

## II.   BACKGROUND[1]

Defendant Town of Lake View ("Lake View") conveyed its sanitary sewer system to Defendant Governmental Utility Services Corporation of Lake View ("Lake View GUSC") on July 13, 1999. Lake View GUSC is a Governmental Services Utility Corporation formed pursuant to Ala. Code § 11-97-1, *et seq*. Lake View's Town Council members sit on and appoint people to sit on the Lake View GUSC board. Lake View GUSC then leased the sanitary sewer system to

---

[1] In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).

Defendants J. Michael White ("White") and SERMA Holdings LLC ("SERMA"). This includes the sewer system that serves the properties owned by the Davises, Slones, and Lawrences.

White and his wife have an "effectively exclusive sewer franchise" through various agreements, loans, leases, and entities. (Doc. 33 ¶91.) SERMA, which is owned by White and his wife, owns a significant interest in Defendant ECO Preservation L.L.C d/b/a Tannehill Sewer ("ECO"), which owns the sewage treatment plant used by the Lake View sewer system. Additionally, White owns and operates Defendant AKETA Management group ("AKETA"), which serves as the customer management company and debt collector for ECO. White also serves as a representative and banking disbursement agent for Lake View GUSC. White's wife wholly owns Defendant Knobloch, Inc. ("Knobloch"). Knobloch is the official permit holder for all pertinent National Pollutant Discharge Elimination System ("NPDES") permits for the wastewater treatment plant and subsequent disposition collected from the sewer system owned, leased, and operated by SERMA and ECO. Finally, Knobloch was and is the developer for the subdivisions connected to the sanitary sewer system of Lake View and nearby annexed areas. The Davises, Slones, and Lawrences all own homes that receive sewer services from ECO.

### A. Case No. 17-533

The Davises purchased and assumed the mortgage on their home in March 30, 2017. However, the Davises did not move into their home until the morning of July 31, 2017. That same morning, Ms. Davis called ECO about their sewer service. Ms. Davis spoke with a representative of ECO, who was also an AKETA employee. The representative told Ms. Davis that she needed to pay $1,072.08 to bring the home's account current. The Davises had not lived in the home prior to July 31, 2017, nor had they discharged anything into the sewer system there. Nevertheless, the representative informed Ms. Davis that a lock was placed on the house's water line due to the delinquency pursuant to ECO's "WATER CUT OFF" policy. The water lines that Defendants cut off under this policy are owned and operated by Warrior River Water Authority, which has no ties to White or his entities.

Later that afternoon, the same representative called Ms. Davis and told her that a padlock had been placed on their water line that morning because the prior lock had been cut off. However, Ms. Davis checked the water and it appeared to be running normally in the house. Ms. Davis told the representative this fact and the representative hung up to investigate the matter. Less than an hour later, the representative called Ms. Davis again and told her a new padlock had been placed on the Davises' water line. The representative informed Ms. Davis that they now

owed $1,200.00 for replacement parts and a padlock, along with a $5,000.00 charge for "tampering" with the lock on the water supply line. (Doc. 33 ¶ 30).

Three hours later, the representative called Ms. Davis again and told her that a technician had stopped by the property to investigate the property and removed the lock. The representative told Ms. Davis that the lock had been tampered with so yet another new lock would be placed on the water line in the morning. The Davises, according to the representative, would now have to pay a total of $6,072.08 to have their water restored.

On August 1, 2017, Plaintiffs sent a letter to ECO disputing the charges, but enclosed a cashier's check for $1,075.00 in hopes of establishing service. This check was returned to the Davises. Later that day, White contacted Ms. Davis to investigate the matter. During the phone call, White refused to discuss the dispute and instead asked Ms. Davis about her company and property in Leeds, Alabama. When Ms. Davis interrupted White to ask for proof or documentation of the alleged lock tampering, White ended the call and told her they would have to settle the matter in court.

On August 5, 2017, the Davises received a letter with an assessment statement telling them that they had "been assessed a penalty fee for Tampering with a Sewer Service Disconnect and Unauthorized Discharge pursuant to

§14.2020 and §14.2040 of the Wastewater Standards, rules and regulations ("Sewer Regulations")."(Doc. 33 ¶42). According to the letter, the Davises allegedly owed a total of $6,669.08 for various "Balance[s] forward" and a "Late Fee," "Finance Charge," "Water Disconnect Fee," "Tampering w/Sewer Service Disconnect" fee, "Unauthorized Discharge – Cut Lock Off Valve" fee, "Security Deposit," and "Account Transfer Fee." (Doc. 33 ¶47). The letter threatened the Davises with criminal prosecution and informed them they had ten days to bring their account current and to replace their water cut-off valve pursuant to sewer regulations. The Davises had never received a copy of these regulations. The letter lastly informed the Davises that these charges had been assessed as a lien on their property. Currently, Defendants allege that the Davises owe $17,156.20.

### B. Case No. 17-1534

The Slones purchased and moved into their house on October 31, 2014. They later temporarily moved out of that house in the summer of 2016 to relocate to Kentucky in pursuit of work. Before they left, Ms. Slone called ECO, AKETA, and/or SERMA to request that their sewer service be temporarily disconnected. Ms. Slone was informed by a representative that a temporary disconnect would not be an issue and sewer services would be suspended until they returned home and

requested a reconnect. The Slones then moved to Kentucky under the belief that their sewer services would be provisionally suspended while they were away.

When the Slones returned to their McCalla home in October of 2016 and attempted to reconnect their sewer service, they were informed that ECO had an "ALWAYS ON" policy, and consequently their sewer service had never been suspended. Over the period of time the Slones were in Kentucky, their sewer service bill accrued to an amount of $3,610.64. After ECO and/or AKETA accepted one payment of $100.00 towards the outstanding balance, the Slones attempted to continue to remit partial payments. However, all other payments were returned for failure to pay the full amount. On July 24, 2017, agents for ECO, AKETA, and/or SERMA disconnected the Slones' water supply service by locking the water cut-off valve located on their property. The Slones were then assessed a charge of $125.00. The Slones were without running water in their home for three weeks. During that time, the Slones were forced to use bottled water and bathe at friends' and family's houses.

Although the Slones' water cut-off valve had been locked, the padlock on the water valve was subsequently removed. The Slones were then charged $500 for "Tampering w/ Sewer Service Disconnect" and $5000 for "Unauthorized Discharge – Cut Lock Off Valve." (Doc. 48 ¶ 45-49.). Defendant Michael J.

Walraven ("Walraven"), the operating manager for Defendants Engineers of the South L.L.C. ("Engineers") and EOS Utility Services L.L.C ("EOS Utility"), then filed a police report for "Theft of Services First Degree" against Nicole Slone for breaking the water valve and removing the lock on the valve. (Doc. 48 ¶ 15.) Defendants Engineers and EOS both provide services for the Lake View sanitary sewer system. Plaintiffs allege that Walraven, Engineers, and EOS were party to the conspiracy among White, his entities, and Lake View and Lake View GUSC because Engineers provided sewer services to the Slones' home, and Walraven filed the incident report on behalf of ECO, SERMA, and /or AKETA. After these assessments, the Slones were alleged to owe $10,180.02, and ECO, AKETA, and/or SERMA apparently filed a lien against the Slones' home in this amount to collect the debt.

### C. Case No. 17-1535

The Lawrences purchased and moved into their home in McCalla on August 17, 2012. Defendant D.R. Horton, Inc. ("Horton") sold the house to the Lawrences. During the purchase process, the Lawrences asked an agent of Horton's whether the sewer system was private or public. The agent told the Lawrences that "the sewer was a Tuscaloosa County System." (Doc. 44.)

After the purchase, the Lawrences paid their sanitary sewer bills on time until February 2017. In February 2017, the Lawrences failed to pay their monthly service fee of $92.00. In the subsequent months, the Lawrences paid additional monies towards their sewer service fees. However, on July 19, 2017, Ms. Lawrence returned home to discover that the water to her home was disconnected. Ms. Lawrence called their water company, Warrior River Water Authority, which informed her that ECO had locked her water line. Ms. Lawrence tried to contact ECO and/or AKETA, but her calls were unsuccessful. The water was cut off pursuant to ECO, AKETA, and/or SERMA policy of cutting off a house's water lines when the homeowner's account became delinquent.

Ms. Lawrence eventually got in contact with Ms. Snow, a representative of ECO, AKETA, and or/ SERMA. Ms. Snow instructed Ms. Lawrence to take the full amount of their alleged outstanding bill of $778.00 to the office of Engineers and EOS Utility. On July 24, 2017, Ms. Lawrence took a check for the amount charged to the office. While at the Engineers and EOS office, Ms. Lawrence was told by a representative that he would take a picture of the check and send it so that Lawrences' water could be restored. Upon her return home, Ms. Lawrence discovered that the water service had been restored.

Several days later, although the charges were supposed to be removed from the account, the Lawrences received a letter stating that they had been assessed "a penalty fee for Tampering with a Sewer Service Disconnect and Unauthorized Discharge pursuant to § 14.2020 and § 14.2040 of the Wastewater Standards, rules and regulations." (Doc. 44 ¶ 40.) The letter threatened criminal prosecution and told the Lawrences they had 10 days to bring their account current and replace or repair the water cut-off valve that was no longer on their water line. Also, included in the letter was an assessment statement in which ECO, AKETA, and/or SERMA claimed that the Lawrences owed $5,500.00 for a "Water Disconnect Fee," "Tampering w/Sewer Service Disconnect," and "Unauthorized Discharge – Cut Lock Off Valve." (Doc. 44 ¶ 40.) The Lawrences, who were never given a copy of the sewer regulations, contested these charges.

Shortly after the Lawrences complained about the charges, Walraven, the operating manager for Engineers and EOS Utility, filed a police report for "Theft of Services First Degree" against Mr. Lawrence for breaking the water valve and removing the lock on the valve. (Doc. 44 ¶ 47.) Since the Lawrences contested the bill, ECO, AKETA, and/or SERMA have refused to accept any partial payments by the Lawrences. Defendants currently allege that the Lawrences owe $24,245.09 and a lien has apparently been assessed on their property to collect the debt.

## III.  STANDARDS OF REVIEW

A party may amend a pleading "as a matter of course within . . . 21 days after serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15. After the time for amending as a matter of course has expired, a party may only amend a pleading "with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *Id.*  Rule 15(a)(2) "contemplates that leave shall be granted unless there is a substantial reason to deny it."[2] *Halliburton & Assocs., Inc. v. Henderson, Few & Co.*, 774 F.2d 441, 443 (11th Cir. 1985). Thus, "ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). All of the Plaintiffs filed their amended complaints within the time prescribed by the Court's Scheduling Orders. As such, they need not show good cause.[3]

---

[2] A district court may deny a motion to amend a complaint on "numerous grounds, such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003) (citation and quotations omitted).

[3] A showing of good cause under Rule 16(b) is only required when a motion to amend is filed after the scheduling order's deadline. *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998); *see Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1299 (11th Cir. 2007).

However, Plaintiffs' amendments to their complaints must not be futile. *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 864 (11th Cir. 2017). "An amendment is considered futile when the claim, as amended, would still be subject to dismissal." *Id.* (citing *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999)). In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quotation omitted). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. 679. This Court then "assume[s] the[ ] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief. *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (citation omitted). This Court considers only "the face of the complaint and attachments thereto" to determine whether a plaintiff states a claim for relief. *Starship Enters. of Atlanta, Inc. v. Coweta Cty.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013).

## IV. DISCUSSION

### A. PLAINTIFFS' IMPLIED MOTIONS TO AMEND THEIR COMPLAINTS

Upon due consideration, Plaintiffs' implied motions for leave to amend ((doc. 33 in Case No. 17-533); (doc. 48 in Case No. 17-534); (doc. 44 in Case No. 17-535)) are due to be granted. Defendants assert in their various motions opposing

the amendments that Plaintiffs' amended complaints fail for many of the same reasons they have asserted in their initial motions to dismiss before this Court, including a lack of specificity in pleadings. However, Plaintiffs' amended complaints address these concerns, as they contain further factual allegations for existing claims and clarify the exact parties that each claim is asserted against.

Moreover, the amendments have not been unduly delayed, nor is there evidence that they were made in bad faith or with a dilatory motive. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Although Plaintiffs filed their amended complaints outside of the initial 21 day window to amend, Plaintiffs' amended complaints were filed within the requisite period for the Plaintiffs to add claims pursuant to this Court's Scheduling Orders. Moreover, these amendments are also the Plaintiffs' first attempt to amend their complaints. Thus, the only remaining question before this Court is whether the amendments would be futile.

The Court finds, after review of both the Plaintiffs' initial and amended complaints, that the amendments would not be futile.

### 1. § 1983 CLAIMS

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."

*West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). To be "acting under state law," the defendant must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49 (quoting *United States v Classic*, 313 U.S. 299, 326 (1941)).

There are three primary tests the Supreme Court has used to determine whether state action exists:

> (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. The public function test limits state action to instances where private actors are performing functions traditionally the exclusive prerogative of the state. The state compulsion test limits state action to instances where the government has coerced or at least significantly encouraged the action alleged to violate the Constitution. The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise."

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (quoting *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993)).

"[T]he symbiotic relationship must involve the 'specific conduct of which the plaintiff complains.'" *Rayburn ex rel. Rayburn,* 241 F.3d 1341, 1348 (11th Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v Sullivan*, 526 U.S. 40, 51 (1999)). "[T]he mere fact that a State regulates a private party is not sufficient to make that party a State actor." *Id.* Therefore, "each case must be analyzed on its own facts to

determine whether the interdependence between the private and state entities reflects sufficient state involvement to sustain a § 1983 claim." *Patrick v. Floyd Medical Center*, 201 F.3d 1313, 1315 (11th Cir. 1999).

Here, Plaintiffs' amended complaints allege sufficient facts to establish state action for the purposes of § 1983. The amended complaints list a number of examples of the entwinement between White, his business entities, and Lake View and Lake View GUSC that demonstrate that Lake View and Lake View GUSC "insinuated [themselves] into a position of interdependence with the [Defendants] that [they were] a joint participant in the enterprise." *Focus on the Family*, 344 F.3d at 1277.

Plaintiffs present sufficient evidence that the Lake View GUSC Board was both dominated by and beholden to White and his various entities to the point of interdependence. Although Lake View GUSC conveyed and leased the sewer system to White and his various entities, it still maintains some control over the sewer system, including the power to set rates and approve regulations. Acting pursuant to these powers, Lake View GUSC approved the regulations White proposed, which were subsequently utilized by White and his various entities to allegedly deprive the Davises, Slones, and Lawrences of their constitutional rights. In particular, Lake View GUSC approved ECO's Rules, Regulations, Policies, and

Procedures that allowed the company to terminate sewer service and cut off a customer's water supply for nonpayment of billing charges or penalties with no ability to contest them. Therefore, Plaintiffs have pled facts that plausibly show that Lake View and Lake View GUSC issued and endorsed the allegedly offending policies like the Defendants in *Focus on the Family v. Pinellas Suncoast Transit Authority*. *See* 344 F.3d at 1277. Moreover, Plaintiffs have alleged sufficient facts to demonstrate that White and his various entities acted in concert with Lake View and Lake View GUSC to make the decision that ultimately caused the alleged harm to Plaintiffs unlike the defendants in the *Patrick v. Floyd Medical Center* case cited by Defendants. *See* 201 F.3d at 1316-17. Thus, the Court finds that the nexus/joint action test is satisfied and that the Plaintiffs' amendments with regards to their § 1983 claims are not futile.

### 2. § 1983 Conspiracy Claims

A plaintiff states a § 1983 conspiracy claim "by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (citing G*JR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)). In order to show an underlying denial of constitutional rights, "the plaintiff must prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th

Cir. 1990) (quoting *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990)). "In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed." *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). A complaint may justifiably be dismissed because of the conclusory, vague, or general nature of the allegations of conspiracy. *Id.* The "naked assertion" of a conspiracy without "supporting operative facts" is not sufficient to state a claim under § 1983. *Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir .1984).

The plaintiff attempting to prove a § 1983 conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Addickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). In other words, the plaintiff must show some evidence of an agreement between the defendants. *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir. 1992). The plaintiff need not show a "smoking gun" to show a conspiracy but must provide "some evidence of agreement between the defendants." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th Cir.2002). Plaintiffs may prove a conspiracy through circumstantial evidence. *Am. Fed. of Labor and Congress of Indus. Orgs.*, 637 F.3d at 1191.

Here, the Court finds that Plaintiffs have sufficiently alleged a plausible §
1983 conspiracy claim. The amended complaints provide circumstantial evidence
indicating agreements beyond merely financial dealings. For example, Plaintiffs
allege that Lake View and Lake View GUSC passed regulations that were proposed
by White implying both an understanding of and support for any conspiracy or
agreement to violate Plaintiffs' constitutional rights through the sewer regulations.
Moreover, Plaintiffs have alleged that Lake View GUSC appointed White as a
representative and banking disbursement agent, again suggesting an
interconnection and agreement between the parties in regards to the actions of the
sewer system. Therefore, amending Plaintiffs' § 1983 conspiracy claim is not futile.

### 3. 15 U.S.C. § 1692 FAIR DEBT COLLECTION PRACTICES ACT CLAIMS

Plaintiffs' amendment of their Fair Debt Collection Practices Act
("FDCPA") claim is not futile. While Defendants initially challenged the
sufficiency of Plaintiffs' FDCPA claim in their motions to dismiss, Defendants in
their opposition to Plaintiffs' amendment have not challenged the sufficiency of
Plaintiffs' amended FDCPA claim. Moreover, the Court finds, upon review of
Plaintiffs' initial and amended complaints, that the amended complaints provide
sufficient factual allegations to support a plausible FDCPA claim. Therefore,
amending Plaintiffs' FDCPA claim is not futile.

#### 4. STATE LAW CLAIMS

Defendants, in their various oppositions to Plaintiffs' existing and proposed additional state law claims, focus not on the futility of the claims if the facts in Plaintiffs' amended complaints are accepted as true, but the futility of the claims because they claim the underlying facts are not true. However, ruling on a motion to amend requires this Court to consider the success of the Plaintiffs' amended complaints under the motion to dismiss standard. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004). That standard requires accepting the allegations in the complaint as true. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). The Plaintiffs' allegations may very well prove to be factually incorrect. Nonetheless, such a conclusion is premature at this juncture.

### B. DEFENDANTS' MOTIONS TO DISMISS

Also pending before the Court are motions to dismiss filed by the Defendants in all 3 cases:

<u>17-1533</u>

- Defendant Lake View (doc. 12);
- Defendants White, ECO, SERMA, AKETA, and Knobloch (doc. 14); and
- Defendant Lake View GUSC (doc. 19)

<u>17-1534</u>

- Defendant Lake View (doc. 16);

- Defendants White, ECO, SERMA, AKETA, and Knobloch (doc. 18);
- Defendant Lake View GUSC  (doc. 31);
- Defendants EOS Utility Services, LLC and Walraven (doc. 44)

17-1535

- Defendant Lake View   (doc. 16);
- Defendants White, ECO, SERMA, AKETA, and Knobloch (doc. 18);
- Defendant Horton (doc. 26);
- Defendant Lake View GUSC  (doc. 27); and
- Defendants EOS Utility Services, LLC and Walraven (doc. 39)

As discussed above, Plaintiffs' amendments address the Defendants' arguments concerning the sufficiency of Plaintiffs' pleadings. Therefore, Defendants' various motions to dismiss are due to be terminated as moot.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs' implied motions to amend their complaints (doc. 33 in No. 17-533), (doc. 48 in No. 17-534), and (doc. 44 in No. 17-535) are due to be granted. Defendants' motions to dismiss are due to be terminated as moot. All Defendants shall answer the amended complaints within ten (10) days of the date of entry of this Order. Defendants are not to file any motion to dismiss if the grounds for such a motion are addressed by this opinion.

**17-1533**

Implied Motion to Amend (doc. 33) is due to be granted;

Motion to Dismiss (doc. 12) is due to be terminated as moot;

Motion to Dismiss (doc. 14) is due to be terminated as moot; and

Motion to Dismiss (doc. 19) is due to be terminated as moot.

**17-1534**

Implied Motion to Amend (doc. 48) is due to be granted;

Motion to Dismiss (doc. 16) is due to be terminated as moot;

Motion to Dismiss (doc. 18) is due to be terminated as moot;

Motion to Dismiss (doc. 31) is due to be terminated as moot; and

Motion to Dismiss (doc. 44) is due to be terminated as moot.

**17-1535**

Implied Motion to Amend (doc. 44) is due to be granted;

Motion to Dismiss (doc. 16) is due to be terminated as moot;

Motion to Dismiss (doc. 18) is due to be terminated as moot;

Motion to Dismiss (doc. 26) is due to be terminated as moot;

Motion to Dismiss (doc. 27) is due to be terminated as moot; and

Motion to Dismiss (doc. 39) is due to be terminated as moot.

An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on September 21, 2018.

L. Scott Coogler
United States District Judge

195126